UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYTUS WHITE,

     Plaintiff,                      Case No. 2:21-cv-11848

                                         District Judge Laurie J. Michelson

v.                                  Magistrate Judge Kimberly G. Altman

A.J.M. PACKING CORPORATION,

     Defendant.

_____/

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 27)
AND
ORDER RESOLVING PLAINTIFF'S PENDING MOTIONS
(ECF Nos. 54, 55, 56, 58, 60, 61, 62, 63)[1]**

### I.     Introduction

This is an employment case.  Plaintiff Tytus White (White) is suing

Defendant A.J.M. Packing Corporation (AJM) alleging that his termination

constituted unlawful disability discrimination under the Americans with

Disabilities Act (ADA).  *See* ECF No. 12.  Under 28 U.S.C. § 636(b)(1), all

pretrial matters were referred to the undersigned.  (ECF No. 6).

Before the Court are AJM's motion for summary judgment, (ECF No. 27),

---

[1] Upon review of the parties' papers, the undersigned deems these matters
appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78(b); E.D.
Mich. LR 7.1(f)(2).

as well as numerous motions filed by White, (ECF Nos. 54, 55, 56, 58, 60, 61, 62, 63),[2] asking the Court to take judicial notice and/or requesting to amend his complaint.  AJM's motion is fully briefed.  (ECF Nos. 43, 51, 57).[3]  For the reasons set forth below, it is RECOMMENDED that AJM's motion for summary judgment be GRANTED and the case be DISMISSED.

## II.    Background

This lawsuit arises out of White's brief period of employment with AJM. The material facts as gleaned from the parties' papers follow.

AJM manufactures "paper plates, cups, bowls, and bags for commercial and retail customers."  (Guy Miele Sworn Statement, ECF No. 27-1, PageID.129).  It does so at "several production facilities across the country, including in Southfield, Michigan."  (*Id*.).  White was hired as a Packer in the Plate Department at this facility.  (*Id*.).  Someone in this position must "gather plates from a conveyor belt and then package and seal the plates securely."  (*Id*.).  The individual then stacks

---

[2] As will be explained, a few of these motions are substantively the same.  It appears that some motions were filed more than once because White e-filed them as well as submitting them in other ways to the Clerk.

[3] White's attorney withdrew around the same time as AJM's motion for summary judgment was filed, which lead to some confusion regarding the briefing as was explained in a December 7, 2022 order.  (ECF No. 35).  For the purposes of this Report and Recommendation, the undersigned focused on the filings docketed as entries 27, 43, 51, and 57 as well as White's pending motions, which are docketed as entries 54, 55, 56, 58, 60, 61, 62, and 63.

the plates in preparation for delivery.  (*Id.*).  A Packer must be able to lift "up to 25 pounds" and perform all of his job duties "on a repetitive basis."  (*Id.*). Additionally, a Packer must "continually use hands to finger, handle, and grab; and reach with hands and arms."  (Pack Job Description, ECF No. 27-2, PageID.136).

Guy Miele (Miele), AJM's long-serving Director of Human Resources (HR), stated in a sworn statement that White's first day of work was Thursday, March 12, 2020.  (ECF No. 27-1, PageID.129-130; White Deposition, ECF No. 27-8, PageID.175).  On that date, White "completed new employee paperwork and began orientation."  (ECF No. 27-1, PageID.130).  HR employee Ciara Voran née Antowiak (Voran) oversaw White's orientation and her responsibilities included "explaining what people were signing and how to fill out new hire forms."  (Voran Deposition, ECF No. 27-5, PageID.144).  The orientation was a group orientation for approximately a half dozen new AJM employees.  (*Id.*).

During orientation, the group "was shown several training films."  (ECF No. 27-1, PageID.130; ECF No. 27-8, PageID.175).  Voran testified that while watching the last film, White pulled her aside to let her know "that he was having some cramps in his hand and wanted to take a break."  (ECF No. 27-1, PageID.130; ECF No. 27-5, PageID.144-145).  Voran permitted White to take a break and notified HR Manager Lisa Collum (Collum) about White's comments. (ECF No. 27-1, PageID.130; Collum Deposition, ECF No. 27-6, PageID.154).

Collum recalled Voran telling her that White said "that his hand had fallen asleep and that he brought up that that happens sometimes, that he had a hand that would go numb if he was in any type of repetitive motion job or work[.]"  (ECF No. 27-6, PageID.154).  Voran also reported that White asked her about the job's lifting requirements.  (*Id*.).

White, however, testified that he never initiated a conversation with Voran or talked to her about his hand at all.  (ECF No. 27-8, PageID.176).  He explained that he told a fellow orientation attendee that "[his] hand fell asleep because [he] was leaning on it," and that Voran appeared to have overheard this remark.  (*Id*.).  After hearing White mention his hand falling asleep, Voran left the room and when she returned, Collum was with her.  (*Id*.).

Collum then held a meeting in her office attended by her, Plant Manager Robert Conchola (Conchola), and White, where she asked White about his alleged comments to Voran.  (*Id*., PageID.176-177; ECF No. 27-1, PageID.130).  According to Collum, White explained "that his hand sometimes goes numb in repetitive motion situations" requiring him to take a break.  (ECF No. 27-1, PageID.130; ECF No. 27-6, PageID.155).  He "also asked about the lifting requirements of the Packer position."  (ECF No. 27-1, PageID.130; ECF No. 27-6, PageID.156).  "Collum reminded [White] that the job of Packer required repetitive motion and some heavy lifting, and stated that she wanted to make sure the Packer

4

position was the right one for him." (ECF No. 27-1, PageID.130; ECF No. 27-6, PageID.155).

Collum testified that at first, White attempted to reassure her that his hand would not be an issue, but about 15 minutes into the meeting appeared to change his mind. (ECF No. 27-6, PageID.155). In the end, Collum told White that he may need to have his hand evaluated by a doctor to make sure "he could perform the essential functions of the Packer position with or without accommodations, or if a different job would be a better fit." (ECF No. 27-1, PageID.130; ECF No. 27-6, PageID.156). Collum also reassured White numerous times that he was not being fired. (ECF No. 27-6, PageID.156).

White's account of the meeting differs significantly from Collum's. (ECF No. 27-8, PageID.177). White testified that Collum questioned him about a prior hand surgery. (*Id*.). He told her that he had cut himself cooking two years prior, but that there was currently "nothing wrong with [his] hand." (*Id*.). Conchola then said, "We can't allow you to work here." (*Id*.). Collum repeated this statement back to White. (*Id*.). At no point did White mention his hand bothering him during periods of repetitive motion. (*Id*.). Neither Conchola nor Collum mentioned "that the job was very repetitive and required heavy lifting[.]" (*Id*.).

After the meeting, White was advised by his roommate to call an attorney about experiencing discrimination. (*Id*., PageID.178). White called a few

attorneys.  (*Id.*).  White does not remember the names of any of the attorneys he called.  (*Id.*).  One of the attorneys "told [White] that [he] had been discriminated against."  (*Id.*).  He suggested that White call AJM and say he would file a complaint if he was not allowed to work there.  (*Id.*).

On Friday, March 13, 2020, the day after White's orientation and his meeting with Collum and Conchola, he called Miele to complain.[4]  (ECF No. 27-1, PageID.131; PageID.27-8, PageID.179).  White told Miele that he was being discriminated against because AJM employees perceived him to have a disability and that he had been scheduled for an illegal medical examination.  (ECF No. 27-1, PageID.131; PageID.27-8, PageID.179-180, 192).  He also told Miele that he had to discuss his hand in a meeting with Collum and a "chunky Mexican," which Miele presumed to be a reference to Conchola.[5]  (ECF No. 27-1, PageID.131; PageID.27-8, PageID.179).  Miele, who had previously been unaware of the developing situation regarding White, said that he told White, he "would look into the situation," (ECF No. 27-1, PageID.131), while White said that Miele told him, "that's not how we do things" and that he would call Collum, (ECF No. 27-8,

---

[4] White testified that he placed around 30 calls to various AJM employees on March 13, 2020, because he was having a hard time finding an employee who could help him and "people kept telling [him] that they were going to call [him] back."  (ECF No. 27-8, PageID.179).

[5] White testified that he said Conchola "was Mexican and he was a little chunky[,]" rather than calling him a "chunky Mexican."  (ECF No. 27-8, PageID.176).

PageID.180, 184).

White testified that he only spoke to Miele once that day, (*id.*), however, Miele testified that they spoke twice, (ECF No. 27-1, PageID.131).  During their second conversation, Miele told White that he had investigated the matter and learned that White "was not being discriminated against but that, because of his comments regarding being unable to work when his hand cramped up, he was being scheduled for a medical examination to determine whether he could perform the essential functions of the Packer position with or without accommodation." (*Id.*).

White testified that at some point on March 13, 2020, Collum called him to ask if he would be willing to undergo a physical examination.  (ECF No. 27-8, PageID.178, 192).  She apologized for what occurred during their meeting and expressed "that it was a misunderstanding on all of our parts."  (*Id.*).

Although Collum could not recall whether it occurred on March 13 or March 16, 2020, she stated that White called her to ask for more detail regarding what would occur during the medical examination.  (ECF No. 27-6, PageID.157).  White was upset and said that they "were discriminating against him."  (*Id.*, PageID.158).  Collum reexplained why AJM was requiring him to undergo a medical examination and that its decision was "based on the conversations that he had had with [AJM employees]."  (*Id.*).  At some point, White also emailed "several copies

7

of something he pulled from the internet about discrimination and orientation and onboarding." (*Id*.).

Collum emailed White on both March 13 and March 16, 2020, with details for the medical examination that she had scheduled for him. (Emails, ECF No. 27-3, PageID.138; ECF No. 27-7, PageID.168-169). In her March 16, 2020 email, Collum explained that the purpose of the examination was

> to determine if you are able to perform the essential functions of the Packer position with or without an accommodation. This was in response to your comments, both in orientation, and the subsequent meeting in my office, about feeling pain and/or discomfort with your right hand/wrist area, in longer-term repetitive motion situations.

(ECF No. 27-3, PageID.138; ECF No. 27-7, PageID.168).

Miele testified that after the weekend, on Monday, March 16, 2020, White called him to say that he had spoken to both the Equal Employment Opportunity Commission (EEOC) and an attorney regarding the discrimination he was facing. (ECF No. 27-1, PageID.132). Miele reiterated that White was not being discriminated against. (*Id*.). Over the course of the day, White called Miele approximately a dozen times. (*Id*.). Miele noted that White was becoming "increasingly more aggressive and confrontational." (*Id*.). Miele instructed White to stop calling him and told him that he need to report for his medical examination the following day. (*Id*.).

For his part, White testified that he called Miele to tell him that Collum's

March 16, 2020 email falsely said that White had complained about his hand to her.  (ECF No. 27-8, PageID.181-182).  White told Miele that he should not have to undergo a physical examination because of Collum's false statements.  (*Id*.).  Miele became upset and accused White of "trying to file a complaint," and told him not to call him again.  (*Id*., PageID.181-182, 184-185).  White immediately tried to call Miele back to explain that he was not trying to file a complaint, but Miele hung up on him.  (*Id*., PageID.182-183, 185).  White estimated that he called Miele approximately a half dozen times between March 13 and March 16, 2020.  (*Id*., PageID.184).  During the Michigan Department of Civil Rights (MDCR) investigation, White submitted his phone records which showed that he called AJM's corporate office, where Miele worked, approximately a dozen times on March 16, 2020, alone.  (MDCR Notice of Disposition and Order of Dismissal, ECF No. 27-11, PageID.249).

According to Miele, White did not stop calling him even after being instructed to stop.  (ECF No. 27-1, PageID.132).  As a result of White's behavior, Miele decided to terminate his employment for "insubordinate conduct."  (*Id*.).  Collum was informed of Miele's decision, and she then prepared a termination report.  (ECF No. 27-6, PageID.157).  She believed that White was being terminated because he refused to undergo a medical examination and to stop contacting AJM employees despite Miele's request.  (*Id*., PageID.158).

The termination report listed March 12, 2020, as White's last day worked and March 13, 2020, as his termination date. (*Id.*, PageID.157). Collum's understanding of the situation was that AJM was "rescinding the [job] offer" seemingly because, even though White was technically employed by AJM, he had not yet started in his role as a Packer. (*Id.*, PageID.157-158). Miele, however, viewed the situation as AJM firing an existing employee. (ECF No. 27-1, PageID.132). Miele acknowledged there was some confusion because in the email sent to White it was "inaccurately stated that [his] 'job offer' was being rescinded." (*Id.*). White responded to the email, expressing "that he felt that [AJM] had discriminated against him." (ECF No. 27-6, PageID.159; ECF No. 27-8, PageID.187).

Following White's termination, AJM paid him for "his employment with AJM and training." (ECF No. 27-1, PageID.132; Paycheck, ECF No. 27-4, PageID.140). Miele stated that AJM "did not regard [White] as being disabled." (ECF No. 27-1, PageID.133).

### III.   Motion for Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing

10

law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotation marks omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' "  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The fact that White is now *pro se* does not reduce his obligations under Rule 56.  Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law."  *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  Additionally, "once a case has progressed to the summary judgment stage, as is true here, the liberal pleading standards under the Federal Rules are inapplicable."  *J.H. v. Williamson Cnty.*, 951 F.3d 709, 722 (6th Cir. 2020) (quoting *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407

F.3d 784, 788 (6th Cir. 2005)) (cleaned up).

## IV.   Discussion

### A.   Overview

#### 1.   White's Claims

In his amended complaint, White alleges three counts under the ADA:

- **Count I** — Disability Discrimination

- **Count II** — Requiring an Impermissible Medical Examination

- **Count III** — Retaliation

(ECF No. 12, PageID.51-59).  The undersigned will consider Count II first, Count I second, and Count III third.

#### 2.   White's Pending Motions

As stated above, White has filed numerous motions since AJM filed its motion for summary judgment.  The Court has ruled on some of these motions already, but eight are still pending.  These motions are docketed as entries 54, 55, 56, 58, 60, 61, 62, and 63.  Each motion will be briefly described in turn below.

- **ECF No. 54 — Motion to take Judicial Notice**

White asks the Court to take judicial notice of inconsistencies and/or misleading statements in Miele's sworn statement as well as Collum's and Voran's depositions.  White says that when he interviewed for the Packer position, the interviewer expressed that a gap in White's work history may

12

be an issue for AJM. White also references "EXHIBIT A" to the motion, but it appears he failed to submit the exhibit.

- **ECF No. 55 — Motion to take Judicial Notice**

  This motion is substantively the same as ECF No. 54. The only difference is that White attached the missing exhibit to this version of the motion. The exhibit is a partially completed form for new AJM hires that asks the new hire to initial various statements indicating that they understand them. (New Hire Form, ECF No. 55, PageID.460). The statements are related to the terms and conditions of employment with AJM. (*Id.*).

- **ECF No. 56 — Motion to take Judicial Notice**

  White essentially says that he was in the pre-employment stage at AJM. He alleges that while he had been offered a job with AJM, he had not yet started working nor completed orientation. He believes that his job offer was rescinded by Collum during the meeting her office and that he never received a new job offer. White says that AJM inaccurately describes the March 16, 2020 email as a termination email even though it was actually an email rescinding White's job offer again. White also directs the Court's attention to various statements made by Miele, Collum, and Voran that he describes as lies.

- **ECF No. 58 — Motion for Judicial Notice**

  Again, White says he was not an employee at the time he was asked to have
  a medical examination.  White explains that the orientation he attended was
  actually a "pre-employment orientation," meaning that the attendees were
  not yet AJM employees at the time of the orientation.  White also attaches an
  exhibit titled "Orientation Check List – Hourly Employees," which lists
  various items that orientation attendees needed to complete or provide.
  (Orientation Check List, ECF No. 58, PageID.488).  Items include a drug
  screen, tax forms, and health insurance enrollment forms.  (*Id*.).  White
  emphasizes that a medical examination was not one of the items on the list.

- **ECF No. 60 — Motion for Judicial Notice**

  This motion appears to be substantively the same as ECF No. 58.

- **ECF No. 61 — Motion for Judicial Notice**

  White "request[s] that the Court order Judicial Notice of more key details
  the defense counsel continues to overlook," such as evidence suggesting that
  he was retaliated against for "opposing the discrimination that [he] endured
  at the hands of [AJM]."  White also explains that his theory of the case has
  only changed as he has learned new information throughout the discovery
  process.  Attached to the motion as Exhibit A is an email from a Concentra
  representative indicating that White was not seen for any employment

14

related medical examinations during March 2020.  (Concentra Email, ECF No. 61, PageID.514-515).  Exhibit B appears to be a printed cellphone screenshot of outgoing calls made on March 16, 2020.  (Phone Call Screenshot, ECF No. 61, PageID.517-518).  Exhibit D (there is no Exhibit C) is part of the charge of discrimination that White filed with the MDCR. (MDCR Charge of Discrimination, ECF No. 61, PageID.520).

- **ECF No. 62 — Motion to take Judicial Notice and to Amend**

  White moves to amend his first amended complaint to change any phrasing suggesting that he was an employee rather than a job applicant during the relevant events.  White explains, "I don't think I was terminated I think I was denied hire."

- **ECF No. 63 — Motion to take Judicial Notice and to Amend**

  This motion appears to be substantively the same as ECF No. 62.

The undersigned has reviewed and considered each of these motions including all of White's arguments and exhibits.  To the extent that consideration of these motions is the relief sought, it is GRANTED.

### B.    Medical Examination

White contends that it was illegal under the ADA for AJM to require him to undergo a medical examination.

Over the last few months, White has filed contradictory motions regarding

15

what stage of employment he believes he was in at the time he was told that he needed to undergo a medical examination. This confusion was caused in no small part by the language AJM HR employees used during the relevant events. Even though both Miele and Collum state that they considered White to be an AJM employee at the time of his termination, the email communicating the news of the termination to White referred to his job offer being rescinded rather than his employment being terminated.

Most recently, White argues in his motions for judicial notice that he was actually in the pre-offer stage of employment when he was asked to undergo a medical examination. White explains that he was in the pre-offer stage because he was terminated by Collum during his meeting with her and Conchola and was never extended a new job offer. However, this understanding of the events is not supported by the evidence, including White's deposition.

At his deposition, White testified that on March 13, 2020, Collum called him and asked him to undergo a medical examination and "revoke the termination." (ECF No. 27-8, PageID.198). Additionally, it is uncontested that White attended orientation on March 12, 2020, for which he was paid as an employee. Accordingly, even when considering the evidence in the light most favorable to White, the contention that he was in the pre-offer stage of employment when he was asked to undergo a medical examination is untenable. White has failed to

demonstrate that there is a genuine issue of fact on this issue. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 769 (6th Cir. 2015) ("Harris's testimony thus fails to create a genuine dispute of fact because it is 'so utterly discredited by the record that no reasonable jury' could believe it.") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

In light of the above, the undersigned will consider whether AJM could legally require White, as a current employee, to undergo a medical examination.

### 1.    Legal Standard

Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  However, when plaintiffs "bring a claim under § 12112(d), [they] are not required to allege that they suffer from a disability as defined by the ADA or that they were discriminated against because of a disability."  *Garlitz v. Alpena Reg'l Med. Ctr.*, 834 F. Supp. 2d 668, 677 (E.D. Mich. 2011); *see also Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011) ("A plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d).").

A judge in this district recently summarized the statutory and regulatory

framework regarding the legality of medical inquiries and examinations as follows:

> [T]he [ADA] prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a).  To advance this goal, the statute restricts employers from requiring medical inquiries and examinations during the hiring process.  42 U.S.C. § 12112(d).  These restrictions vary in degree – from most restrictive to least restrictive – among three categories: (1) pre-offer job applicants, (2) post-offer candidates, and (3) current employees.  42 U.S.C. § 12112(d)(2)-(4).
>
> *Pre-Offer Job Applicants*.  The type of inquiries prospective employers may pose to pre-offer job applicants are the most limited.  Employers may not (1) compel pre-offer job applicants to undergo medical examinations, (2) ask them whether they have a disability, or (3) inquire into "the nature or severity of such disability."  42 U.S.C. § 12112(d)(2)(A); *see also* 29 C.F.R. § 1630.13(a).  But employers may ask about an applicant's ability "to perform job-related functions."  42 U.S.C. § 12112(d)(2)(B); *see also* 29 C.F.R. § 1630.14(a).  And they may ask applicants to "describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions."  29 C.F.R. § 1630.14(a).
>
> *Post-Offer Candidates*.  Prospective employers are moderately restricted when imposing conditions of employment on post-offer candidates.  Employers may require post-offer candidates to undergo medical examinations before starting a job – "and may condition an offer of employment on the results" of those examinations – so long as "all entering employees are subjected to such an examination regardless of disability."  42 U.S.C. § 12112(d)(3)(A); *see also* 29 C.F.R. § 1630.14(b).
>
> *Employees*.  Finally, employers are least restricted when obtaining information from employees.  Employers may require "a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity."  29 C.F.R, § 1630.14(c); *see also* 42 U.S.C. § 12112(d)(4)(A).  They may also ask about the "ability of an employee to perform job-related functions."  29 C.F.R, § 1630.14(c); *see also* 42 U.S.C. § 12112(d)(4)(B).

*McBratnie v. McDonough*, No. 20-cv-12952, 2023 WL 3318029, at *3-4 (E.D. Mich. May 9, 2023) (internal footnote omitted).

2.   Application

As stated above, White was an AJM employee when he was required to undergo a medical examination.  Requiring such an examination is legal so long as it "is job-related and consistent with business necessity."  29 C.F.R, § 1630.14(c); *see also* 42 U.S.C. § 12112(d)(4)(A).

"An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). "[H]ealth problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999).  "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id*. at 811.  Moreover, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id*. at 811-812.

19

The Packer position indisputably required an individual to use his hands to repetitively grab plates off a conveyor belt, stack them, and package them.  The position also required an individual to be able to lift up to 25 pounds.  While the exact statements White made about his hand are disputed, it is not disputed that whether White enjoyed full use of his hand was placed in doubt during orientation. White said during orientation that his hand was either cramping or numb, and then further discussed his hand with Collum.  During that conversation, White, at the very least, disclosed that he had injured his hand during a kitchen accident that led to him requiring surgery.  A relatively recent hand surgery combined with White's statement during orientation that his hand was either numb or cramping could cause a reasonable person to question whether White would be able to perform the job, which required the constant use of his hands in a repetitive manner.  Thus, AJM did not violate the ADA when it required White to undergo a medical examination before letting him return to work.

### C.      Unlawful Termination

White argues that his termination was unlawful both because it constituted disability discrimination and because it constituted retaliation.  Each argument will be addressed in turn below.

#### 1.      Disability Discrimination

White first argues that AJM fired him because it perceived him to have a

disability.

Under the ADA, an employer cannot discharge a qualified employee "on the basis of [a] disability."  42 U.S.C. § 12112(a).  To prevail on his claim, White must first "establish a prima facie case" of disability discrimination.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).  If he does so, "the burden shifts to [AJM] to articulate some legitimate, nondiscriminatory reason for its actions."  *Id.* (internal quotation marks and citations omitted).  If AJM articulates such a reason, then White "must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination."  *Id.*

a.    Prima Facie Case

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show '(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability.' "  *Talley*, 542 F.3d at 1105 (quoting *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002)).  "Furthermore, the disability must be a 'but for' cause of the adverse employment action."  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016).

A disability, for the purposes of the ADA, is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an]

individual; (B) a record of such an impairment; or (C) being regarded as having

such an impairment."  42 U.S.C. § 12102(2).  "An individual meets the

requirement of 'being regarded as having such an impairment' if the individual

establishes that he or she has been subjected to an action prohibited under this

chapter because of an actual or perceived physical or mental impairment whether

or not the impairment limits or is perceived to limit a major life activity."  42

U.S.C. § 12102(3)(A).  "[A]n individual may fall into the definition of one

regarded as having a disability if an employer ascribes to that individual an

inability to perform the functions of a job because of a medical condition when, in

fact, the individual is perfectly able to meet the job's duties."  *Ross v. Campbell

Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

Even though AJM argues that White has failed to establish the first element,

for the purposes of considering the instant motion for summary judgment, the

undersigned will assume without deciding that he has.  The record demonstrates

that multiple AJM employees were concerned about White's hand, which had been

injured in a cooking accident approximately two years before he was hired by

AJM.  The injury required surgical intervention and left a visible scar.

### b.    Legitimate Reason and Pretext

Because it is being assumed that White has established a prima facie case of

discrimination under the ADA, AJM must proffer a legitimate, nondiscriminatory

22

reason for White's termination.  It has done so by asserting that it terminated White

for insubordination.  AJM claims that White's continued calls to Miele and other

AJM employees after Miele explicitly instructed him to stop calling constituted

insubordination.  "Failure to follow instructions and insubordination are legitimate,

non-discriminatory reasons for discharging an employee." *EEOC v. St. Joseph

Paper Co.*, 557 F. Supp. 435, 439 (W.D. Tenn. 1983); *see also Russell v. Univ. of

Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (finding that failure to follow

instructions and directions constitutes legitimate reason for discharge);

*Raadschelders v. Columbus State Cmty. Coll.*, 377 F. Supp. 3d 844, 853, 858 (S.D.

Ohio 2019) ("The Sixth Circuit has repeatedly held that insubordination may

constitute a legitimate, nondiscriminatory reason for adverse action.").

In order to overcome AJM's proffered reason for termination, White "must

provide evidence 'which tends to prove that an illegal motivation was *more* likely

than that offered by the defendant' to prove that the proffered reason for

termination did not actually motivate the decision." *Kerwin v. Cmty. Action

Agency*, No. 22-1510, 2023 WL 3413906, at *4 (6th Cir. May 12, 2023) (quoting

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)

(emphasis in original), *overruled on other grounds by Gross v. FBL Fin. Servs.,

Inc.*, 557 U.S. 167 (2009)).  "Pretext, however, cannot be shown by attacking the

decision itself." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 490 (6th Cir. 2000)

(citing *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 898 (6th Cir. 1997)).

Furthermore, "a plaintiff's subjective interpretations or feelings are insufficient to

establish pretext." *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 480 (6th

Cir. 2017); *see also Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508,

513 (6th Cir. 2012) ("[The plaintiff's] subjective belief that she was not

insubordinate is insufficient to rebut [the defendant's] nondiscriminatory reason.").

Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the

employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394,

400 n.4 (6th Cir. 2009).

White has failed to overcome AJM's proffered reason for termination.  The

record shows that even if AJM regarded White as having a disability, it wanted to

have White undergo a medical examination rather than terminate his employment.

However, White's insubordinate behavior in regard to Miele caused AJM to

reevaluate.  Even though White denied calling Miele excessively,[6] (ECF No. 27-8,

PageID.185), the MDCR found that White's phone records undermined White's

denial.  According to the MDCR, the phone records showed that White called

Miele approximately a dozen times in one day.  Moreover, even if Miele decided

to terminate White for some other nondiscriminatory reason like finding his

---

[6] White testified that he called Miele approximately 6 times during the relevant
period.  (ECF No. 27-8, PageID.184).

repeated phone calls to be merely annoying rather than insubordinate, this is not

pretext in the employment discrimination context. *See Askin v. Firestone Tire &*

*Rubber Co.*, 600 F. Supp. 751, 755 (E.D. Ky. 1985) ("But the 'pretext' must be a

pretext for discrimination, not a pretext of some other ill-advised or unreasonable

factor, such as a personality conflict or unreasonably high but evenly applied

standards of performance.").

　　In sum, White's claim that he was illegally terminated because AJM

perceived him to have a disability cannot survive the pretext stage of the

discrimination inquiry.  Therefore, AJM is entitled to summary judgment on this

claim.

## 2.　　Retaliation

　　White's final claim is that AJM terminated him in retaliation for

complaining about discrimination to Miele.

　　"The ADA prohibits employers from 'discriminat[ing] against any

individual because such individual has opposed any act or practice made unlawful

by this chapter.' " *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 531

(6th Cir. 2020) (citing 42 U.S.C. § 12203(a)).  "A plaintiff need not actually be

disabled to assert a claim of disability retaliation.  The person, however, must have

a reasonable and good faith belief that the opposed act or practice is unlawful

under the ADA." *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 840 (6th Cir.

2002) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-580 (6th Cir. 2000)). "To establish a prima facie case of retaliation . . . , a plaintiff must show that (1) they engaged in a protected activity; (2) the employer knew of that activity; (3) the employer took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Robinson*, 821 F. App'x at 531.

The second and third elements are easily established in this case. White complained of discrimination to Miele, who was the decisionmaker in this case for AJM. White's employment with AJM was terminated and "[t]ermination from employment is an adverse employment action." *Barrett*, 36 F. App'x at 843.

As to the first element, "[p]rotected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Robinson*, 821 F. App'x at 532; *Barrett*, 36 F. App'x at 842 (explaining that "a communication may be protected even if it is vague or inartful," so long as the plaintiff "articulate[s] opposition to what she reasonably believes to be unlawful activity under the ADA"). It is undisputed that at least some of White's communications with Miele were to protest what White believed to be an unlawful medical examination. For the purposes of this motion, it will be assumed that White's belief was reasonable.

As to the fourth element, "[t]o show a causal connection, a plaintiff must produce sufficient evidence to infer that an employer would not have taken the

26

adverse employment action had the plaintiff not engaged in a protected activity."

*Barrett*, 36 F. App'x at 841.  "A causal connection may be shown by direct

evidence or by knowledge of the complaints on the part of the employer coupled

with a closeness in time sufficient to create an inference of causation."  *Id*.  "But

temporal proximity alone generally is not sufficient to establish causation, and

generally must be coupled with other indicia of retaliatory conduct."  *Eyster v.

Metro. Nashville Airport Auth.*, 479 F. Supp. 3d 706, 719-720 (M.D. Tenn. 2020)

(citing *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020);

*Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019)).  "Moreover, other

facts [can] negate any inferences that may arise from the temporal proximity

between the protected activities and [the] plaintiff's termination."  *Barrett*, 36 F.

App'x at 843.  Ultimately, the "[p]laintiff must establish that nothing he did, such

as poor performance or attitude, precipitated the adverse employment action."

*Samadi v. State of Ohio, Bureau of Emp't Servs.*, No. C2-99-563, 2001 WL

175265, at *8 (S.D. Ohio Feb. 13, 2001).

White is unable to establish element four (causal connection) of his prima

facie case.  He has not put forth evidence showing that he was terminated because

he complained to Miele about the medical examination being illegal or for any

other reason related to protected conduct.  Instead, the record establishes that after

White's first conversation with Miele, Miele investigated the matter and

27

determined that White was appropriately scheduled for a medical examination.

It was not until White called Miele approximately a dozen times in one day (despite being asked not to do so) that he decided to terminate White. The MDCR reviewed White's phone records and corroborated Miele's assertion that White called him these many times. Ultimately, White has not produced " 'sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' had [he] not engaged in the protected activity." *Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 856 (M.D. Tenn. 2012) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). Therefore, AJM is entitled to summary judgment on White's retaliation claim.

## V.    Conclusion

For the reasons set forth above, the undersigned RECOMMENDS that AJM's motion for summary judgment, (ECF No. 27), be GRANTED and the case be DISMISSED.

Additionally, because the undersigned considered all of White's pending motions, (ECF Nos. 54, 55, 56, 58, 60, 61, 62, 63), when making this recommendation, the motions have been resolved and the Court ORDERS that the docket reflect the same.

Dated: May 18, 2023                    s/Kimberly G. Altman
Detroit, Michigan                      KIMBERLY G. ALTMAN
                                       United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the court determines that any objections are without

29

merit, it may rule without awaiting the response.

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2023.

<u>s/Carolyn Ciesla</u>
CAROLYN CIESLA
Case Manager
